Thank you, everyone. Good morning. The cases will be called in the order listed on the docket. The first two cases, Ramos-Reeby v. Bondi and Serrano-Osorio v. Bondi have been submitted on the briefs. Our first and only case on calendar for argument today is Brothers Market v. United States. Counsel for appellants, please approach and proceed. Good morning, Your Honors. May it please the Court. My name is Andrew Tapp. I'm counsel for both Brothers Markets and both of their respective appeals. As I understand it, we have two minutes for rebuttal. I will mind the clock. There's two issues I want to primarily address this morning with you, and the first of which is this notion that neither of the Brothers Market cases offered any supporting evidence aside from unsubstantiated claims within affidavits. That's not factually accurate at all. Well, isn't your burden to provide disputing evidence, evidence that contradicts? And, for example, you have a bunch of receipts. But is the agency correct that none of those receipts evidenced any of the transactions that they were relying on to establish the suspicious patterns? No, that is fundamentally inaccurate. Okay. Now, since the District Court focused solely on Scan B-2, that is the close-in-time transactions that usually it's transactions for more than about $75 in the aggregate up to about 48 hours in time, we have a list of transactions in both cases. Brothers Market 1, for example, transactions 49 and 50 relied upon by the agency to indicate that there was trafficking are actually contained within the record. Those two itemized, detailed receipts are located at ER 404. Transactions 45 and 46 are located at ER 403. But does that tell us? So each of these transaction receipts will tell you exactly what it was that the household bought. And because EBT does not permit the retailers to question why the household is buying what they buy, as long as they're presenting eligible food items and they have their card and their PIN number, the retailer is forced to process the transaction. And so But even if we take the receipt as evidence that, you know, the transaction reflected in the receipt was a genuine transaction, I think the agency said there were 142 sets of very close-in-time transactions for the same household that they thought were suspicious. And you produced receipts for, I believe, 11 of those, which leaves 131 that we, that they think are suspicious and that you haven't given any explanation for. So what do we do with those? Well, so, Your Honor, a couple of things. The first is that Program Specialist Ryan Ahern with the USDA acknowledged that it's not unusual for households to shop at the same retailer every day or so. So to some degree, a lot of those transactions, especially when you get outside of the same day, so you're talking about two consecutive days, I don't think that those carry as much weight. Now, with respect to the other transactions, I think we fall inside of what the Sixth Circuit considered in the Euclid market case, which is it's not so much that the retailer has the obligation to explain each and every one of those transactions, but rather to contest that the transaction characteristics cited in the EBT analysis are not indicative of trafficking, but rather are the result of legitimate purchases of eligible food items on EBT. And what is, I mean, so I read Mr. Brown's declaration, I think, and he does explain why the nature of the population that you're serving might explain some of the very large purchases of coffee and that sort of thing. But I didn't really understand him to explain why the same person would make two separate transactions a minute apart. What is the explanation for that? So the explanation is, I'm going to go back to the fact that the retailer is not allowed to ask, right? We have to treat each one of these customers the same way we would cash debit credit. So if they don't normally ask cash debit and credit why they would do that, they're not allowed to ask these other individuals. Having said that, based upon my client's experience, these people are buying food for other homeless individuals. Now, these stores are both located in Skid Row, and the homeless population shops differently than your average household. Part of that is because they have nowhere to store. They may not have any means to cook. They might have like a Bunsen burner, effectively, to heat water. But that's all that they've got. Now, you can see sort of a similar situation in the Skyson USA versus U.S. case out of Hawaii, where your local homeless population shops so much differently, the way that we see here, Scan V2 is implicated, because these people don't have jobs, frequently have mental health or substance abuse issues. They come in, they buy for themselves repeatedly, they'll buy for their friends repeatedly, and they'll essentially exchange favors outside. So, you know, I can use your tent, I'll buy you the food. The other explanation for this is that we have a population... But again, that explains what they're buying, you know, the bulk purchases of coffee, which I suppose you can resell, right? But it doesn't explain why when you're buying a bunch of stuff, like, you know, within the space of a couple minutes, why you would do that in two transactions rather than one. So a lot of times these households will split the transactions. They will get up to the counter, they will present their pile. And if they're buying for their friend, their friend will have a pile. And they'll agree, perhaps $50, you're going to have $50 or $100. And so you're going to tabulate this out while you're gathering items at the counter. But without... We're dealing with 10 to 15 second differences in time. And so no baskets, no carts, I guess, armfuls of large Nescafe containers or other high value items. All of that is taking place and recorded within 10 or 15 seconds? A lot of them are 10 or 15 seconds. Several of them are a minute or more. I mean, the majority are a minute or more. If you look through the receipts that I pointed out in the record, you can see the transactions process. Now, part of that is because we have a computerized point of sale system. And you can see the receipts are itemized, they're clearly computer generated. And so you can process these two transactions simultaneously. Well, you can, but... So you've got one declaration. Yes, sir. And I think a series of customer statements were before the agency. For whatever they're worth. None of them describe a specific transaction or even, I think, avert that one of the transactions in one of the patterns was actually conducted in the way that the Brown declaration speculates. Is that right? Well, to begin with, I don't believe the Brown affidavit speculates. I think that's personal knowledge. But outside of that, the receipts support that. It has to be personal knowledge sufficient to create a genuine dispute of material fact. And when you have patterns of hundreds of transactions, and Mr. Brown doesn't contest a single one or even a range of the transactions at issue, doesn't connect the dots to create a dispute. How is that enough to carry the burden on summary judgment? I think it's important for the court to consider. It's not that Mr. Brown is expected, or Brothers Markets, are expected to address each and every single one of these transactions. But he doesn't address not a customer, not a cashier, not even Mr. Brown addresses a single transaction. That's what the receipts do. And particularly Brothers Market, too. We have many more receipts from Brothers Market, too, including receipts that are very close in time that show these transactions legitimately processing. Well, the receipts could just as much. Of course, there's going to be a receipt for even an illegal transaction, even a trafficking transaction. I think that's the agency's theory. That if you have a receipt for $100 and everything adds up, there's not even anything in the record or even an argument that does the math that would show, for example, why we'd see a couple dozen $99 and $100 transactions or anything. Again, there's a lot of evidence stacked against your client, and there's just no narrative, no sworn narrative in the record that directly refutes it. You've got receipts over here, but there's no declaration that's explaining the receipts. You do that in your briefs. You have the declaration over here, but the declaration doesn't identify the specific transactions that they're contesting. So how is that enough? Well, again, it's not the specific transactions. It's the transaction characteristics that the agency indicates are indicative of trafficking. Now, the other alert scan you just referenced is scan A2, and this is part of the problem that we talk about and whether or not this is actually admissible information coming from the agency. Scan A2 goes into effect in 2019. It's never tested. It's never statistically correlated to trafficking to begin with. So the fact that there's 57 transactions out of 7,200 that happen to be in this $3 range doesn't necessarily mean anything evidentially unless you have some sort of nexus between that and the act of trafficking. Is that disputed, though? I mean, is there anything there that shows that, well, you know, you could ring that up? I mean, for example, five containers of Nescafe ends up to be $100 or some other containers. Yes, sir. There's no one who actually says that that's what they were purchasing. That's what the receipts show, that that's what they were purchasing on those transactions. And I understand the court's frustration. If I had every receipt, certainly this would be a different story. Well, you don't even have a cashier who says that I rang this up or a customer who says that I purchased this. The bottom of the receipts, and the customers are a different complicated issue I'll get to in a moment. The bottom of the receipt indicates which cashier it was. There is no record, I'm sorry, there is no affidavit in the record from those exact cashierists. I believe by the time we got to judicial review, they'd moved on and are not located, not capable of being located. The households are a different can of worms. But just to clarify on that, Judge Johnston mentioned the $99 and $100 transactions, and this is a Brothers Market II issue.  I didn't think that you did have receipts for those transactions. Have you produced receipts to explain those? I believe we had some. So those are $99 and $100. These transactions are duplicative, right? So you can have an alert scan that has the same transaction listed four times, as long as it meets the criteria for all four. So the fact that these transactions came to $99 and $100, there's a number of $100 receipts in the record. There's some $99 receipts in the record. Are you saying those receipts don't reflect actual purchases? No, ma'am. I'm saying they reflect actual legitimate food purchases. And because we were here on summary judgment, this is an issue where we were supposed to be viewing the evidence in a light most favorable to the retailer. And again, I go back to the Euclid Market case where we had a retailer who had some receipts, not all receipts, had very similar explanations to what this retailer has offered here, and the court allowed it to proceed to trial. Where are the receipts in the record for the $99 and $100 purchases? Where are those in the record? So if I may for just a moment. And because we have two... How many transactions were at issue in that category? So there were 50, I'm going to estimate, there were 57 transactions that were at issue in that particular category. That's A2. And how many receipts were there? Off the top of my head, I can't tell you exactly how many receipts satisfy that. Can you tell us where we can go in the record to verify? Yes. So it's going to be Exhibit E in both records. Brothers 2 is what I have in front of me right now. So for example, ER 359, and that's going to be AR 511, is going to be where those receipts are located. This is Brothers 2. And the issue that we have, obviously, with both of these cases combined is there's a lot of documents to go around between the two, and there is differences between the two cases. With respect to Brothers 1, they're located in the ballpark of ER 404. That's the beginning of my notes on them, so they're about ER 400. And again, those receipts show that the transaction characteristics that the USDA has identified as indicative of trafficking are not actually indicative of trafficking. Final issue I wanted to touch... How does this show that? They show that they're legitimate purchases, that these people are shopping the way that my client is saying that they shop. So I've gone through that range and don't see a single receipt for a transaction between $100 or $99 by Brothers Market 2. Which case? Brothers Market 2. While I wait for Mr. Varshavy's, I'll look through the again, and I've got about 30 seconds before I'm going to step aside. With respect to Alert Scan A2, this is not... There is no evidence anywhere that those particular transactions correlate to trafficking. I've talked sort of extensively in the reply brief, so I won't hit it too much here. But the way that Congress set this up, the idea was to disqualify retailers quickly who they felt like were trafficking, and then to allow these retailers to go all the way through the judicial process under 7 U.S.C. 2023, and have the entire case exposed to the federal evidentiary code. I'm going to go ahead and yield my time. All right. Thank you, counsel. Good morning, Your Honors. Assistant United States Attorney Zach Varshavy on behalf of the United States. May it please the Court. Appellant's arguments fail under the law of this circuit and the relevant statutory text. Under Kim, the burden is on the retailer to create a genuine dispute of material fact as to whether they trafficked. And much of what is in appellant's briefing and much of their argument is an attempt to from that burden, which is firmly placed on them to produce competent evidence outside of the administrative stage. And as to their complaints as to what transpired at the administrative stage, this Court made clear in Kim that the administrative process satisfies the strictures of procedural due process. And that's why in this trial de novo setting, they can go outside of what happened administratively. They can track down their customers and ask their customers to explain the transactions. They can ask their employees to explain whether they process these flag transactions. The agency provided to them in great detail each of the specific flag transactions as to the date, the time, the amount, and the second. Mr. Varshavy, how much would be enough for the plaintiff to contest to defeat this? This is kind of a pattern transaction issue. Sure. I think that for purposes of summary judgment, the retailer should put forward a preponderance of evidence and explanations as to why customers are shopping in these unusual ways at their store. Well, we have lots of explanations. I mean, I think that's the area that's the declaration and the arguments are replete with explanations for the shopping patterns. But if even then, there's the assertion, well, how do you explain these particular sets of transactions? Do they have to come up with receipts for all of them? Not necessarily that they specifically have to produce receipts, but they do need to provide, and to your honor's point earlier, sworn explanations. They can do so in a variety of ways. They're not limited. But if the explanation, I mean, for the explanation that's been suggested for the large transactions, like the six cases of coffee, is that the customers are reselling them, which is, I think, a violation of the rules on the part of the customer. But it's not the store's job to police that, is it? Well, the store is obligated to prevent trafficking directly and indirectly. So the store has to make sure that the customers aren't going to resell the stuff that they're  If the store is aware that that's happening, then the store is not permitted to conduct that transaction. Did the agency charge that? No, your honor. Okay. So that's not at issue here. So in other words, if we point to these large transactions and the instant coffee transactions, if that's the explanation, why isn't that enough to defeat that suspicion as to those large transactions? Well, that's only a thimbleful out of the ocean full of transactions that were flagged. And so, sure, they can explain that certain transactions were these large, vast purchases of Nescafe, which is reflected in the receipts. But to the district court's point, that only reflects what was entered. It still could be a fraudulent transaction. And they're not explaining why these households were spending in this fashion at their store, as opposed to the other 57 and 58 stores within a one-mile radius for such large transactions that would be better stocked. I mean, I guess they did explain that they have, because of where they're located, like sort of a different population that maybe is more likely to engage in this sort of behavior. And a moment ago, you said they didn't have sworn explanations. You're not suggesting that they need a declaration from the customer admitting to engaging in trafficking, are you? No, your honor. Okay. So then what? I mean, they've got receipts that are consistent with their view of how it works. They have a declaration from Mr. Brown describing the customer population, at least with respect to the, and you have another issue too, but with respect to the large transactions, what more would they need to do? I think that what they also could have done is have their own employees provide affidavits explaining specifically, I conducted these transactions on these dates. These customers were purchasing unusually large amounts for these very reasons and providing those sworn explanations. For these reasons, how on earth does the clerk know the reason? I mean, they don't, they're not required to. And in my experience, like I don't think I've ever been asked by a clerk at a grocery store, why are you purchasing these items? Sure. I should be more specific, your honor. Only in the sense that the actual cashiers could explain the nature of what was happening as to these large purchases. So for instance, if it was Nescafe, where the employee would ever, under penalty of perjury, that customers were coming in with huge armfuls of Nescafe and checking out at our small checkout counter with no baskets or carts, that would be something to go off of. But they don't even provide that. They had the opportunity to do so under the DeNovo review under 7 U.S.C. 2023, where they could go outside the administrative record. They had the opportunity to produce that kind of evidence, and they chose not to. But they put in, I mean, is it the agency's view that the receipts are not genuine? I mean, because we have a declaration from Mr. Brown, and I think he says, you know, these are actual receipts from the store. So I mean, one possibility is that he's lying and that the receipts are just made up. But unless the receipts are just made up, it seems like that is reflective of transactions that people engaged in, right? They are reflective, Your Honor, but only of a small portion of the transaction. So there's other categories and types of transactions that were flagged as well, such as benefit-depleting transactions, the rapid transactions, the transactions in $99 and $100 and a varying amount of cents and change. And so the receipts can only explain so much for them to carry their burden that's placed on them under Kim. And so that's really the issue, is that the receipts only go so far. Even if each and every one of the receipts in the small amount corresponded to certain flag transactions, and some of them did, it still doesn't explain all the other suspicious patterns that were flagged and the shopping behavior there and why it occurred at their store as opposed to any of the other 36 or 37 other convenience stores within the one-mile radius. Well, I guess I think the markets frame this as maybe an issue of whether the patterns were expert testimony or some of these. But there is this, I guess, concern, setting those evidentiary questions aside, that this is a trial-by-spreadsheet, that there's a long list of these transactions. There is a charging document, and there's argument as to what these patterns show, to which we have a declaration that provides a threadbare but minimal response to explaining those transactions. And I guess I'm wondering, from the agency side, where's the narrative theory that's kind of tying this all together from your end? I mean, we can't take the agency's speculation to grant summary judgment, certainly, any more than we could take the owner's explanation to deny it. Sure. A couple of responses, Your Honor. So as to the actual admissibility of the flagged transactions, Congress expressly permitted the agency under 7 U.S.C. 2021-A2 to base permanent disqualifications on transaction reports and inconsistent redemption data. But two, I want to emphasize, Your Honor, that was merely the starting point of the agency's analysis. It built on those flagged transactions, and this is at the case analysis document, where it compared the average amount of the transactions to the state and county average. It compared those transactions to other nearby stores of a similar categorization, the convenience stores. It also, the agency, did an in-store, in-person inspection, where it documented the inventory, the nature of the store, and its layout, as well as its stock. And then two, the agency also did a household analysis and looked at specific shopping patterns of the households that shop there. And so the respective case analysis document that lays out all this body of evidence is on, in Brothers Market 1, ER 99 to 137, and Brothers Market 2 is in ER 93 through 137. And so there's quite a bit of circumstantial evidence that was found and supported that the store had trafficked. And that's the schemes that Congress expressly permitted. And so if we think, I mean, even assuming that there's no fraud, right, if we just look at all the stores that use SNAP benefits, and we make a list of how many large transactions do you have, how many close-in-time transactions do you have, there's gonna be some range, right? And somebody is going to be an outlier. And so one thing that's just a little bit odd about this whole mode of proceeding is that it's not clear to me, having read the report, I understand that they're an outlier on these metrics, but it's not clear to me why that is enough to raise an inference that they're engaging in trafficking, as opposed to just in the spectrum of stores that there are, they happen to be at one end of the distribution. So what do we do with that? I think that, with respect to your honor, it was, the transaction spread over five months. It was a significant period of time. So it was, I would submit that were this an aberrant one-off transaction, or just a small handful of transactions, we might be talking about something quite different. But this was a whole slate of transactions over five months that then, too, did not get explained away by the in-store inspection, by the household shopping analysis, by the nature and stock of the store, as opposed to other larger stores within the one-mile radius. There were so many attempts to try and explain away the aberrant nature and fraudulent nature of the transactions and the patterns they're in. And it never held up, even with what the retailer had the opportunity to submit. The nondescript bank statements did not explain this shopping behavior. The credit card statements didn't do that. The photos they provided did not do that. The receipts only covered so little. And then, too, they always had access to their employees, and they also were able to get affidavits from their customers. They could have had explanations from their employees and their customers as to why these transactions were happening in the manner that they were. Well, I guess, you know, had this been a trial on the briefs, I think that would be pretty powerful in terms of the respective burdens of production, et cetera. But going to Judge Miller's question, there's no permissible inference here? A reasonable jury could not find, based on this record, that these patterns were all fraudulent? No, Your Honor. And that's because they did not go beyond what was submitted administratively, other than the self-serving affidavit that the district court found, submitted by Brad Brown, where he did not explain that he actually conducted any of these transactions, and all the other patterns that were flagged as suspicious. And so, under this court's precedent, Kim, the burden really is on the retailer to establish a genuine dispute of material facts. The problem is, I guess, Kim is helpful only to a point. I mean, Kim, you're dealing with direct, personal narrative evidence of the fraud. And again, we're just dealing with these spreadsheets of transactions that are alleged to be patterns. Fair enough. And I would direct the court to this court's decision in PON. PON is a more recent case in time, in 2021. That is, on all fours, compared to this case, in terms of the numerous patterns of flagged transactions that were not explained. And instead, the only response that the retailer had provided was this self-serving affidavit, which is not sufficient to defeat summary judgment. Right, but PON isn't published, so we can't rely on that. Fair enough, Your Honor. It is still persuasive authority, and it does lay out in very detailed fashion the relevant key points that the agency is allowed to rely on this exact type of evidence under 2021-A2, and two, that the retailer needs to explain at summary judgment the nature of the transactions. And as true as it was then, as it is in this case, they did not do so. And so I see I'm low on time. If the court has no further questions, I'll submit. Thank you, counsel. Thank you, Your Honors. Rebuttal. Thank you, Your Honor. Briefly, to answer the court's question right before I sat down, there is one transaction receipt in the Brothers Market 2 case that pertains to Scan-A2. That's going to be a $99.99 transaction located at ER386. That correlates with transaction number 8 from the charge letter. And that's out of about 50-plus transactions in those. I think that's a good example here. So we've got an ocean of 50-plus transactions that are alleged to be a pattern. Is one substantiating receipt, if we take it as such, enough to create a genuine issue? The Rhode Island case, let me go pull the case name on that, I think talks, and that's Lucius v. Rhode Island, 2018 U.S. District Court, Lexis 54357. This case talks specifically about the dangers of raw data interpretation. Our argument here is that that's pure chance. Whether or not there's a lot of transactions that land in $99 or $100 is pure chance. The government has offered that as indicative of trafficking, but has never provided an evidentiary support for that particular correlation. And that's why, again, I know I've argued this a thousand times and the court probably thinks that I'm crazy, but the way that the 7 U.S.C. 2021 subsection A2 was set up was to allow the administrative process to move forward very quickly. They're allowed to use these EBT alert scans to be able to issue initial disqualifications. It was not to excuse the government's performance in showing that the evidence that they relied upon is admissible. And the Sanders case talks about that specifically. Just because it was okay at the administrative level does not mean that it's okay before the judiciary. We have to go through the evidentiary process. These are statistics. They're subject to federal rules of evidence 702 and 701. Can I ask, so I mean, I asked Mr. Varshavy a question along these lines. You're right that as a matter of pure chance, you would expect some number of round number transactions. The government thinks that you're an outlier in terms of the number that you have. I mean, this seems to be something that, you know, one side or the other could put in some expert statistical analysis on to explain that the number is or is not greater than might be expected from random variation. Whose burden is it to do that? It's the government's, your honor. The government is offering this evidence to indicate that trafficking exists. Now, obviously we're still, we have the burden of proof to show the trafficking did not exist. But for the government's part, they rely entirely upon these alert scans. And the government offering them as indicative of trafficking means that they have to find a mechanism that they can use to bring it to the court for consideration. When you go through the case analysis document, as Mr. Varshovy pointed out, it's rote speculation. Everything that the program specialist does is he guesses about why the household would or would not do that. And when they pick comparison stores, as we pointed out in both of our briefings to the district court, those comparison stores closed at six o'clock or eight o'clock at night. You see these spikes in the transactions that happen at my client's stores, which are in the same general area, starting in the evening. It's because these are the only two stores in existence. I believe from our standpoint, we're arguing that these transaction characteristics are not indicative of trafficking. I think we met our burden for summary judgment. Can I ask one more question? Oh, sure. So are you saying that the district court erred in receiving this information as part of the summary judgment proceedings? Yes, Your Honor. We argued before the district court that this was inadmissible and could not be considered by the court. So the district court did not accept your argument. So where's the error? The error is on a legal basis. In order to be able to consider that information, it would have had to have satisfied some rule of evidence for admission. And we contested that it shouldn't have been considered under the Rule 56 motion because it didn't comply with the evidentiary requirements thereof. Evidentiary requirement, did it fail to comply with? So you're not allowed to just simply put in affidavits that aren't of personal knowledge, right? I think Sanders talks about that specifically. But if someone has reviewed information that's in the possession of, I haven't forgotten about you. That's in possession of the agency and summarizes that evidence, why is that inadmissible? They do not have, so I believe it was John Yorgeson in this case who is the head of the administrative and judicial review branch. He verified that the administrative record was accurate. That was what his representation was. Brian Ahern was the program specialist who actually did all the analysis and work. Section Chief Okunovic is the one who reviewed it and made the decision. Mr. Yorgeson- Is it your objection specifically lack of personal knowledge? Is that your objection? I mean, technically it's a violation of rule 701 which requires that any specialized mathematical or statistical information, scientific information has to be admitted under 702 with an expert. Agency didn't name anyone as an expert, certainly not Mr. Yorgeson. So there's no vehicle for this information- So your objection is that because there was no expert testimony, this evidence was inadmissible? Yes, Your Honor, that's correct. All right. I just went when you stood up at the beginning of this rebuttal. Yes, sir. I just want to make sure I got it. Was it ER 386? ER 386, that's Brothers Market 2. Because I'm looking at that and that's a $27.85 or six cents. I'm showing AR 538 in the bottom right-hand corner of that page. Brothers Market 1 or 2? This is 2. Oh, that's ER 380, I think. Yeah, so 386- So that's a $99.99. Yes, Your Honor. Transaction, I see. Okay, thank you. Yes, Your Honor. So I believe I've exhausted my time. All right, thank you. Thank you to both counsel for your helpful arguments. The case is argued is submitted for decision by the court that completes our calendar for the morning. We are in recess until 9 30 a.m. tomorrow morning. All right.
judges: RAWLINSON, MILLER, JOHNSTONE